WO                     IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


JONATHAN LONGNECKER, et al.,          )
                                      )
                    Plaintiffs,       )
                                      )
          vs.                         )
                                      )
AMERICAN EXPRESS COMPANY, et al.,     )
                                      )          No. 2:14-cv-0069-HRH
                    Defendants.       )
_____)


<u>O R D E R</u>

<u>Motion to Proceed as Collective Action</u>

The Named plaintiff moves for conditional certification of a collective action.[1]  This motion is opposed.[2]  Defendants move for leave to file a sur-reply.[3]  This motion is opposed.[4]  Oral argument was requested on both motions but is not deemed necessary on either motion.

_____

[1]Docket No. 22.

[2]Docket No. 55.

[3]Docket No. 63.

[4]Docket No. 65.

## Background

The Named plaintiff is Bonita Kathol.[5]  Defendants are American Express Company and AMEX Card Services Company.

Kathol is a former employee at defendants' Phoenix call center.  In her amended complaint, Kathol alleges that defendants have violated the Fair Labor Standards Act (FLSA) because defendants did not pay overtime for pre-shift work and work performed during unpaid meal breaks.[6]  Kathol brings her FLSA claim on behalf of herself and other similarly situated current and former employees.

Kathol and the former Named plaintiffs were all employed as "collections specialists."[7]  More specifically, Kathol and the former Named plaintiffs all worked in defendants' Global Credit Administration (GCA) business unit.[8]  The GCA is divided into

---

[5]Originally, Jonathan Longnecker, Erandi Acevedo, Jennifer Flynn, and Janet Seitz were also Named plaintiffs.  However, the claims of these Named plaintiffs were dismissed pursuant to defendants' motion to compel arbitration.  Docket No. 50.

[6]Kathol had also alleged that defendants failed to properly calculate her regular rate of pay, but she has withdrawn these allegations.  Docket No. 54.

[7]Declaration of Bonita Kathol at 2, ¶ 1; Declaration of Erandi Acevedo at 2, ¶ 1; Declaration of Jennifer Flynn at 2, ¶ 1; Declaration of Jonathan Longnecker at 2, ¶ 1; and Declaration of Janet Seitz at 2, ¶ 2; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[8]Declaration  of Jeanne Stout at 1, ¶ 5, Exhibit A, Defendants' Opposition [etc.], Docket No. 55.

two departments, Credit and Fraud; and Kathol and the former Named plaintiffs, during

the relevant time, all worked in the Credit department.[9]

Kathol avers that she had to spend approximately 15 minutes before the start of her

shift each day "pulling up" the call center's computer system and reviewing company

memos and emails.[10] The former Named plaintiffs make similar averments.[11] Kathol avers

that "[i]f I had arrived at my work station at the time my shift was scheduled to begin, I

would have been unable to start the necessary programs on my work computer by my paid

start time and would have been considered late to work by American Express."[12] The

former Named plaintiffs make similar averments.[13] Kathol further avers that she was told

by her supervisors "not to list any time spent performing work tasks prior to [her]

---

[9]Id. at 1, ¶ 5 & 2, ¶ 8.

[10]Kathol Declaration at 2-3, ¶ 4, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[11]Acevedo Declaration at 2-3, ¶ 4; Flynn Declaration at 2-3, ¶ 4; Longnecker Declaration at 2-3, ¶ 4; Seitz Declaration at 3, ¶ 6; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[12]Kathol Declaration at 4, ¶ 8, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[13]Acevedo Declaration at 3-4, ¶ 8; Flynn Declaration at 3, ¶ 8; Longnecker Declaration at 3-4, ¶ 8; Seitz Declaration at 4, ¶ 11; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

scheduled shifts ... because the company would not pay for it."[14]  The former Named

plaintiffs make similar averments.[15]

Former Named plaintiff Janet Seitz worked in departments other than GCA Credit

during her tenure with defendants.[16]  She avers that

> [w]hile employed in positions other than collections specialist
> at the call center, I also performed pre-shift work in order to
> pull up the necessary computer programs.  The only difference
> in the pre-shift work performed in positions other than
> collections specialist was that some of the computer programs
> were different.  It took approximately the same amount of time
> daily to pull up the necessary computer programs and review
> memos and emails prior to my scheduled shift in each position
> that I had at the Phoenix call center.[[17]]

Kathol also avers that when she worked a shift that was 8 hours or longer, she was

given a 30-minute unpaid meal period, that she was required to "log off" the phone system

during her meal break, and that she would return to her work station on average 10

minutes prior to the end of her unpaid meal period in order to "pull[] the phone program

---

[14]Kathol Declaration at 3, ¶ 7, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[15]Acevedo Declaration at 3, ¶ 7; Flynn Declaration at 3, ¶ 7; Longnecker Declaration at 3, ¶ 7; Seitz Declaration at 4, ¶ 10; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[16]Seitz worked for defendants for over 13 years.  Seitz Declaration at 2, ¶ 1, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[17]Id. at 3, ¶ 7.

back up on my work computer, review[] the performance tracking program updates on the computer, review[] company emails and memoranda, and meet[] with my supervisor."[18] The former Named plaintiffs made similar averments.[19]  Kathol avers that she "was instructed to write a 30-minute unpaid meal period on all my timesheets for all scheduled shifts 8 hours or longer, regardless of whether I worked during part of the meal period" and that if she had "returned to [her] work station as [her] meal break was ending, [she] would have been considered late by American Express, because [she] would not have been able to resume fielding phone calls to customers until [she] completed pulling the necessary programs back up and reviewed email updates and memoranda."[20]  The former Named plaintiffs make similar averments.[21]  Seitz also avers that "[w]hile employed in positions at the Phoenix call center in addition to collections specialist I engaged in the same tasks for approximately the same amount of time during my unpaid meal periods.  The only

---

[18]Kathol Declaration at 2, ¶ 3 & 4, ¶¶ 12-14, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[19]Acevedo Declaration at 2, ¶ 3 & 4, ¶¶ 12-14; Flynn Declaration at 2, ¶ 3 & 4, ¶¶ 12-14; Longnecker Declaration at 2, ¶ 3 & 4, ¶¶ 12-14; Seitz Declaration at 2, ¶ 5 & 5, ¶¶ 15-17; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[20]Kathol Declaration at 4-5, ¶¶ 15-16, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[21]Acevedo Declaration at 4-5, ¶¶ 15-16; Flynn Declaration at 4, ¶¶ 15-16; Longnecker Declaration at 4-5, ¶¶ 15-16; Seitz Declaration at 5-6, ¶¶ 19-20; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

difference was that some of the programs that I had to pull up were different in different positions."[22]

Defendants, however, contend that it is not their policy to require employees to perform off-the-clock work either pre-shift or when returning from unpaid meal breaks. Rather, defendants contend that it is their policy that non-exempt employees record all time worked. In December 2010, defendants "began rolling out formal written timekeeping policies ('Timekeeping Requirements') to different Business Units...."[23]  Jeanne Stout, defendants' Director of Global Employee and Labor Relations, avers that "[a]lthough the Timekeeping Requirements are different in several respects, they all consistently state that employees are to record all time worked on their timesheets, employees are not to perform any off-the-clock work, and employees are not to work during their breaks or meal periods."[24]  The Timekeeping Requirements for GCA in the Phoenix call center were rolled out in October 2011.[25]  The "Clarification" that was given to Customer Care Professionals[26] in the GCA Credit department instructed employees to "not perform any work during

---

[22]Seitz Declaration at 5, ¶ 18, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[23]Stout Declaration at 2, ¶ 15, Exhibit A, Defendants' Opposition, Docket No. 55.

[24]Id. at 3, ¶ 16.

[25]Id. at ¶ 17.

[26]"At one point, Collections Specialists were called Customer Care Professionals." Id. at 2, ¶ 8.

breaks", to "not perform any work prior to the start of your shift or during meal periods

unless you receive approval from leadership", and to "[m]ake sure that you record on your

timesheet all of the time you spend performing work-related tasks, such as taking calls,

completing paperwork, reading work-related e-mail, etc."[27]   The Clarification further

provided that employees were to

- Record on your time sheet the time that you sit down at the scheduled beginning of your shift and start the process of logging into your computer, this is considered your start time
- Log into your computer system and any necessary applications and systems, including the **dialer**[28]]
- When all necessary applications are open, click on "**Get Next Case**"[29]]

On November 18, 2011, Kathol signed an acknowledgment that she had read and

understood the Timekeeping Requirement Clarification.[30]   Defendants also offer evidence

from current employees who aver that management routinely communicates and enforces

---

[27]Clarification of Timekeeping Requirements for Customer Care Professionals (On Phones) in U.S.-Based Global Credit Administration Locations at 1, Tab 2, Stout Declaration, Exhibit A, Defendants' Opposition [etc.], Docket No. 55.

[28]A dialer automatically routes phone calls to an employee's computer. Defendants' Opposition [etc.] at 5, Docket No. 55.

[29]Clarification of Timekeeping Requirements for Customer Care Professionals (On Phones) in U.S.-Based Global Credit Administration Locations at 1, Tab 2, Stout Declaration, Exhibit A, Defendants' Opposition [etc.], Docket No. 55.

[30]Tab 3, Stout Declaration, Exhibit A, Defendants' Opposition [etc.], Docket No. 55.

defendants' policy that no off-the-clock work is to be performed.[31]   And, defendants contend that the clearest evidence that they do not require employees to work off-the-clock is that they consistently pay non-exempt employees overtime if they work more than 40 hours per week.[32]

Kathol avers that "[d]uring the time that I worked at the Phoenix call center, there were approximately 7,000 employees who dealt with phone calls to and from customers. These employees were subject to the same policies as me with respect to having to arrive

---

[31]Declaration of Jennifer Clarke-Williams at 2, ¶ 8 ("The team leaders ... are very strict about timekeeping.  They don't want us doing any work at all before we are on the clock.  They have definitely reinforced this with me"); Declaration of John Monty at 2, ¶ 6 ("I recall reviewing and agreeing to timekeeping rules that clearly stated that I am not allowed to do anything work-related before I log in to the system....  My team leader ... reinforces that message in team meetings"); Declaration of Barbara Robles at 1, ¶ 4 ("When I started with the company in 2012, I was told in training to make sure that if I come in early, I do not log into the computer or review any emails or work until my actual start time.... [T]hat general directive to not do anything work-related until I am getting paid has not changed"); Declaration of Johanna Rodriguez at 1, ¶ 5 ("The team leaders make it very clear – you do not work during lunch); Declaration of Dawn Saylor-Costello at 2, ¶ 10 ("The company periodically distributes the written timekeeping policy that applies to Credit, and my team leader typically reviews it with the whole team"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[32]Declaration of Tamra Crosby at 2, ¶ 8 ("I tend to sign up for overtime whenever it is available...  I always get paid for all of the time that I work"); Monty Declaration at 3, ¶ 12 ("There has been no overtime available in my segment for some time.  But when I have [worked overtime], I have always gotten paid the full amount I was owed"); Declaration of Marcia Plante at 3, ¶ 11 ("if I get stuck on a call and have to stay a few minutes late, I just reflect that on my timesheet, and the system automatically tabulates my overtime....  I always get paid that time"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

early [and] having their lunch breaks shortened[.]"[33]   The other Named plaintiffs make similar averments.[34]

Kathol contends that defendants also operated three other call centers during the statutory time period: 1) the Fort Lauderdale, Florida call center, 2) the Greensboro, North Carolina call center,[35] and 3) the Salt Lake City, Utah call center.   She avers that the employees in these other call centers "who performed the same tasks as me ... would have been subject to the same policies as me with respect to having to arrive early [and] having their lunch breaks shortened[.]"[36]   The former Named plaintiffs make similar averments.[37]

However, defendants contend that employees in different departments and business units have varying job titles,[38] have work schedules that vary widely,[39] have different lunch

_____

[33]Kathol Declaration at 5, ¶ 21, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[34]Acevedo Declaration at 5, ¶ 21; Flynn Declaration at 5, ¶ 21; Longnecker Declaration at 5, ¶ 21; Seitz Declaration at 6-7, ¶ 26; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[35]Defendants closed this call center at the end of January 2011.  Stout Declaration at ¶ 4, Exhibit A, Defendants' Opposition [etc.], Docket No. 55.

[36]Kathol Declaration at 6, ¶ 22, appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[37]Acevedo Declaration at 5-6, ¶ 22; Flynn Declaration at 5, ¶ 22; Longnecker Declaration at 5-6, ¶ 22; Seitz Declaration at 7, ¶ 27; all appended to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

[38]Declaration of David Clendening at 1, ¶ 2 ("my job title is Customer Care
(continued...)

breaks,[40] use different phone systems[41] and computer programs,[42] and either read emails

and memos during "idle time" between calls or during paid time off the phones.[43]

---

[38](...continued)
Professional TSC -T2- CFS"); Declaration of Jerry Morales at 1, ¶ 2 ("I served as a Collections Specialist T3 in Manual Case Setups"); Robles Declaration at 1, ¶ 1 ("My job title is Account Protection Specialist T4"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[39]Monty Declaration at 1, ¶ 3 ("I work 10 hour shifts on Monday and Sundays, 6.5 hour shifts on Tuesdays and Wednesdays, and a 7 hour shift on Thursdays"); Plante Declaration at 1, ¶ 3 ("I work from 4:55 am to 1:55 pm, Monday through Thursday, and from 4:55 am-10:55 am on Friday"); Robles Declaration at 1, ¶ 8 ("My current schedule is 9:30 a.m. to 6:00 p.m., Monday through Friday"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[40]Declaration of Pam Doty at 2, ¶ 7 ("I receive a 30-minute unpaid meal break"); Declaration of Morris Mellor at 2, ¶ 8 ("I receive ... a 40-minute meal break. The meal break consists of 30 minutes unpaid time and 10 minutes paid time"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[41]Crosby Declaration at 1, ¶ 2 ("I handle both inbound and outbound calls, although I am not on a computer-based dialer"); Monty Declaration at 1, ¶ 2 ("I would estimate that 90% or more of my calls are inbound, through the dialer"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[42]Clarke-Williams Declaration at 2, ¶ 7 ("it can sometimes take up to 10-15 minutes" to get computer applications, programs, and spreadsheets up and running); Clendening Declaration at 2, ¶ 6b ("I begin to launch my computer and bring up my applications, which takes no more than 1.5-2 minutes"); Plante Declaration at 2, ¶ 7 ("It usually takes me about 5 minutes to get my computer up and running, and to launch the CSP servicing platform that we use to access cardmember information"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[43]Monty Declaration at 3, ¶ 9 ("I manage my time well and review [CNIS] emails in between calls, during idle time"); Plante Declaration at 3, ¶ 10 ("if I need a few more minutes to review [CNIS emails], I can just ask my Team Leader for the time off the
(continued...)

Kathol now moves for conditional certification of a collective action consisting of "[a]ll present and former employees who have worked at any American Express call center for any time period since January 14, 2011 in positions that handle calls with the public, customers or vendors regardless of the position title."[44]

<u>Discussion</u>

The FLSA requires employers to pay employees at least the federally-prescribed minimum wage and one-and-a-half times the employee's regular rate of pay for hours worked above forty hours in a workweek, unless the employee is exempt.  29 U.S.C. §§ 206(a), 207(a).  "Section 16(b) of [the] FLSA authorizes an employee to bring an action on behalf of similarly situated employees, but requires that each employee opt-in to the suit by filing a consent to sue with the district court."  <u>Does I thru XXIII v. Advanced Textile Corp.</u>, 214 F.3d 1058, 1064 (9th Cir. 2000).  "FLSA collective actions serve to lower the cost of litigation for individual claimants and promote efficiency in resolution of claims and the use of judicial resources."  <u>Bollinger v. Residential Capital, LLC</u>, 761 F. Supp. 2d 1114, 1119 (W.D. Wash. 2011).  "In order to make certain that potential collective class members are

_____

[43](...continued)
phones"); Doty Declaration at 1, ¶¶ 5-6 (reads CNIS emails during the five minutes she is given before she has to start taking calls or during idle time); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[44][Proposed] Notice of Lawsuit against American Express Company and Amex Card Services Company, attached to Plaintiffs' Motion to Proceed as a Collective Action [etc.], Docket No. 22.

notified of the action and their right to take part, the courts may authorize the issuance of notice by the named plaintiffs in an FLSA action to all other putative class members." Id. "The decision to certify a collective action under the FLSA is within the discretion of the [c]ourt." Singleton v. Adick, Case No. CV 09–486–PHX–JAT, 2009 WL 3710717, at *4 (D. Ariz. Nov. 2, 2009).

"To certify a class action under the FLSA, the [c]ourt must determine whether Named Plaintiffs and potential opt-in members are 'similarly situated.'" Id. (quoting 29 U.S.C. § 216(b)). Courts in this district have used the two-tiered approach to analyze whether the named plaintiffs and potential opt-in plaintiffs are "similarly situated." Id. "Under the two-tiered approach, during the early stages of litigation, the [c]ourt evaluates the case under a lenient standard and may grant conditional certification." Id. "The [c]ourt then reevaluates, usually prompted by a motion for decertification, the 'similarly situated' question at a later stage, once discovery has produced sufficient information regarding the nature of the claims." Id.

This case is at the early stages of litigation, and Kathol has moved for preliminary or conditional certification. "At this stage, the court 'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" Wood v. TriVita, Inc., Case No. CV–08–0765–PHX–SRB, 2009 WL 2046048, at *3 (D. Ariz. Jan. 22, 2009) (quoting Thiessen v. General Electric Capital

Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)).  "All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA."  Wertheim v. Ariz., Case No. CIV 92–453 PHX RCB, 1993 WL 603552 at *1 (D. Ariz. Sept. 30, 1993)(emphasis added). "Given that a motion for conditional certification usually comes before much, if any, discovery, and is made in anticipation of a later more searching review, a movant bears a very light burden in substantiating its allegations at this stage."  Prentice v. Fund for Public Interest Research, Inc., Case No. C–06–7776 SC, 2007 WL 2729187, at *2 (N.D. Cal. Sept. 18, 2007).

> Courts have looked to several factors in determining whether plaintiffs are similarly situated for purposes of § 216(b), including:
>
>> (1) whether there is evidence that the alleged activity was part of an institution wide practice; (2) the extent of the similarities among the members of the proposed collective action, in particular whether the members all are challenging the same employment practice; and (3) the extent to which the members of the proposed action will rely on common evidence.

Wood, 2009 WL 2046048, at *3-4 (quoting Trinh v. JP Morgan Chase & Co., 2008 WL 1860161, at *3 (S.D. Cal. April 22, 2008)).  While the court does not make factual determinations at this stage, "neither the remedial purposes of the FLSA, nor the interests of judicial

economy, would be advanced if [the court] were to overlook facts which generally suggest that a collective action is improper." West v. Border Foods, Inc., Civil No. 05-2525 (DWF/RLE), 2006 WL 1892527 at *7 (D. Minn. July 10, 2006).

Kathol has shown that she is similarly situated to current and former employees in the Phoenix GCA Credit department. Her declaration and the declarations of the former Named plaintiffs show that Phoenix GCA Credit department employees were all subject to the same practice of not being compensated for work they were required to perform prior to their scheduled shifts and during their unpaid meal breaks. In order for conditional certification to be appropriate, Kathol need only allege that she and potential opt-in plaintiffs were subject to a common plan, policy, or practice. Although defendants had a written policy that prohibited off-the-clock work, Kathol has made a sufficient showing that defendants had a practice of requiring Phoenix GCA Credit department employees to perform pre-shift work and work during meal breaks for which they were not compensated. See, e.g., Amador v. Morgan Stanley & Co., Case No. 11 Civ. 4326(RJS), 2013 WL 494020, at *6 (S.D.N.Y. Feb. 7, 2013) (allegations and "evidence indicating that Morgan Stanley's formal policy" of requiring employees "to accurately record all of their time worked, including overtime ... was obviated by a de facto policy—known to managers or supervisors at thirteen of Morgan Stanley's branches").

-14-

Defendants have offered the declarations of current Phoenix employees who work in the GCA Credit department who aver that they are not required to perform unpaid pre-shift work and work during their meal breaks.[45]  But, all these declarations do is raise factual disputes, which are premature because the court does not decide factual disputes during the first stage of the certification process.  See Thomas v. Kellogg Co., Case No. C13–5136 RBL, 2014 WL 716152, at *2 (W.D. Wash. Jan. 9, 2014) (finding "arguments relat[ing] to the intricacies of the specific facts surrounding the Plaintiffs' job duties, and its claims (on the merits) that Plaintiffs can't meet their ultimate burden of proof on their misclassification claims" premature); Barrera v. US Airways Group, Inc., Case No. CV–2012–02278–PHX–BSB, 2013 WL 4654567, at *5 (D. Ariz. Aug. 30, 2013) ("The Court does not resolve factual disputes regarding the [employees'] job descriptions or job duties at this first step of the certification process").  As another court in a FLSA call center case observed,

> [a]lthough the evidence submitted by the defendants tends to contradict the plaintiffs' evidence and to reveal potential weaknesses in their case, it does not preclude conditional

---

[45]Crosby Declaration at 1 ¶ 3 ("I do not perform any work-related tasks until my [shift] start time of 12:30 pm"); Doty Declaration at 1, ¶ 3 ("No one has ever told me that I need to get in early to prepare for work, and I perform no work duties" during the 15-25 minutes she is there prior to the start of her shift); Monty Declaration at 2, ¶ 6 ("I do not do anything work-related before the beginning of my shift or when I am off the clock"); Plante Declaration at 1, ¶ 5 (I don't understand why anyone would do any work before they log in and start getting paid.  It is certainly nothing that the company has ever asked or expected me to do"); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

certification. As explained above, the plaintiffs' evidence suggests, at a minimum, that some hourly employees have performed uncompensated pre- and post-shift tasks. "Where, as here, plaintiffs have adduced sufficient evidence to meet step one's 'extremely lenient standard' for conditional certification, evidence offered by the defendant purporting to show plaintiffs are not similarly situated to absent class members, while significant after discovery and during the step-two analysis, does not compel denial of conditional certification."

Benson v. Asurion Corp., Case No. 3:10–cv–526, 2010 WL 4922704, at *5 (M.D. Tenn. Nov. 29, 2010) (quoting Gallagher v. Lackawanna County, No. 3:CV–07–0912, 2008 U.S. Dist. LEXIS 43722, at *27–28 (M.D. Pa. May 30, 2008)).  In addition, despite averments to the contrary,[46] the declarations submitted by defendants have a "'heightened potential for

_____

[46]In each declaration offered by defendants, the employee avers

I am aware that a former GCA Collections Specialist filed a lawsuit against American Express Company and AMEX Card Services Company claiming that she and other AmEx Service Center employees were not paid for all time worked, and that the company did not properly calculate the regular rate of pay used for overtime calculations. I understand that I could bring a similar claim if I chose to do so.  I have not been coerced or threatened in any way to give the information in this declaration.  I understand that I do not have to give this information; that I may provide or refuse to provide a declaration; and that giving the information in this declaration is not a condition of my employment with AMEX Card Services Company.  I understand that nothing would occur relative to my job if I refused to give this declaration.

Clarke-Williams Declaration at 4, ¶ 14, Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

coercion because where the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive.'" <u>Mevorah v. Wells Fargo Home Mortg., Inc., a div. of Wells Fargo Bank</u>, Case No. C 05-1175 MHP, 2005 WL 4813532, at *4 (N.D. Cal. Nov. 17, 2005) (quoting <u>Belt v. Emcare, Inc.</u>, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003)).

Kathol has also met her burden of showing that she is similarly situated to other Phoenix call center employees whose primary job function is to handle phone calls with clients, vendors, or the public.  Kathol and the former Named plaintiffs all aver that other Phoenix call center employees were subject to the same practice concerning pre-shift work and work during meal breaks as they were.  In particular, it is reasonable to infer that Kathol, who worked for defendant for 12.5 years, " would learn, during the normal course of h[er] employment ... what other similar employees are doing[.]" <u>Aguayo v. Oldenkamp Trucking</u>,  Case No. CV F 04-6279 ASI LJO, 2005 WL 2436477, at *4 (E.D. Cal. Oct. 3, 2005). In addition, Seitz, who has worked in other departments in the Phoenix call center besides the GCA Credit department, avers that employees in other business units were subject to the same unlawful practice.  This evidence is sufficient to satisfy Kathol's light burden at this first stage of the certification process.  Although defendants offer the declarations of current Phoenix employees outside of Kathol's business unit who aver that they are not

-17-

required to perform unpaid pre-shift work and work during their meal breaks,[47] these declarations merely raise factual disputes that the court cannot resolve at this point.

But, Kathol has not met her burden of showing that she is similarly situated to employees in other call centers who have similar job functions.  Kathol's and the former Named plaintiffs' averments that employees in other call centers "would have been subject" to the same policies or practices as they were are insufficient.  It is not reasonable to infer that Kathol (or the former Named plaintiffs) would have learned about other employees in other locations, particularly in light of the evidence that defendants have offered that suggests that  employees in one call center rarely interacted with employees in the other call centers.[48]  In addition, former Named plaintiffs Longnecker, Acevedo, and

---

[47]Mellor Declaration at 2, ¶¶ 8-9 ("I do not perform any work during my breaks or lunch" and "[m]y Team Leader has never asked me to start doing anything associated with work ... during my breaks or lunch period"); Robles Declaration at 2-3, ¶¶ 11 & 14 ("I don't do any work whatsoever before I log into the phone" and "I don't do any work during" lunch break); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

[48]Clarke-Williams Declaration at 3, ¶ 13 ("I do not communicate with people at other call centers other tha[n] routine business-related calls, like when a call is transferred.  I do not know anything about their timekeeping practices or policies."); Crosby Declaration at 3, ¶ 11 ("I don't interact much with anyone outside my immediate area.  I do not know what team leaders in other groups, or other centers like Fort Lauderdale or Salt Lake City, instruct their teams to do with respect to timekeeping, or what their policies are."); Saylor-Costello Declaration at 3, ¶ 12 ("[m]y only interaction with other Collections Specialists is when we dial-transfer phone calls to another department, which may get picked up by another service center.  I have never had any conversations about any timekeeping practices or policies with any AmEx employee from another service center."); Exhibit B, Defendants' Opposition [etc.], Docket No. 55.

Flynn could not possibly have any knowledge of policies and practices at the Greensboro call center, as they aver, because the Greensboro call center was closed prior to their working for defendants.  In short, Kathol has offered nothing more than speculation that she is similarly situated to employees in other call centers who have similar job duties.  The Timekeeping "Clarification" that defendants have submitted, which appears to apply to all employees in "U.S.-Based Global Credit Administration Locations", not just to Phoenix call center employees,[49] may be evidence that defendants apply the same _written policy_ in all call centers.  But it is not evidence that employees in other call centers beside Phoenix are subject to the unlawful _practice_ concerning pre-shift work and working during meal breaks that Kathol has alleged.

Because the court is granting  Kathol's motion to proceed as a collective action in part, it must consider Kathol's requests that defendants be required, within 20 days, to provide her counsel with the names, personnel ID numbers, addresses and email addresses of any potential class members who have worked for defendants since January 14, 2011 and that she be allowed to issue her proposed notice to potential class members.

Plainly, the proposed notice cannot be issued because it defines a nation-wide class and the class that is being conditionally certified is limited to Phoenix call center employees whose primary job function is to handle phone calls with customers, vendors, and the

---

[49]Tab 2, Stout Declaration, Exhibit 1, Defendants' Opposition [etc.], Docket No. 55.

public.  In addition, Kathol agrees with defendants that any references to the former Named plaintiffs should be removed from the notice as should any reference to the withdrawn claim regarding regular rate calculation.  The parties should be able to resolve most of the other potential problems with the notice that defendants have identified and the court will give them fourteen days in which to do so.  However, because the parties are unlikely to be able to resolve the arbitration issue, the court will address that issue now.

Defendants argue that any notice should be limited to current and former employees who have opted out of the Arbitration Policy.[50]  In other words, defendants want any individuals who signed the Arbitration Policy or failed to opt out of the Arbitration Policy excluded from the class definition.

Kathol takes great exception to defendants' suggestion that notice should be limited to those individuals who have opted out of the Arbitration Policy.  Kathol contends that it is well-established that when arbitration agreements are in play, the court should issue the notice and then the defendant can move to compel arbitration.  Kathol cites to Mowdy v. Beneto Bulk Transportation, Case No. C 06-05682 MHP, 2008 WL 901546 (N.D. Cal. March 31, 2008), Krstic v. J.R. Contracting & Environmental Consulting, Case No. 09–2459, 2011 WL 1042732 (D.N.J. March 16, 2011), and Davis v. NovaStar Mortg., Inc., 408 F. Supp.

---

[50]Defendants' motion to file a sur-reply on this issue is denied because Kathol did not raise this issue for the first time in her reply brief.  Rather, in her reply brief, she was responding to defendants' contention that notice should only be given to employees who had opted out of the Arbitration Policy.

2d 811 (W.D. Mo. 2005), in support of this contention.  In <u>Mowdy</u>, the defendants argued that employees who had signed arbitration agreements should be excluded from the notice but the court rejected this argument because "the defendants have not sufficiently developed the record as to the nature of the arbitration agreements at issue, and it is unclear what number of individuals have signed either a current or former version of the agreement or whether the agreements are valid." <u>Mowdy</u>, 2008 WL 901546, at *6.  Thus, "[t]he court ... reserve[d] its determination as to the validity of the arbitration agreements until after notice [was] mailed and those receiving it ... had an opportunity to express an interest to join the suit." In <u>Krstic</u>, the court permitted notice to go to approximately 100 putative class members even though the defendant argued that most of them had signed arbitration agreements. <u>Krstic</u>, 2011 WL 1042732, at *7.  The court stated that "[a]t the appropriate time," it would "most likely subdivide similarly situated employees into two categories: (1) one subclass for employees who have signed arbitration agreements, and those claims will be transferred to arbitration; and (2) one subclass for employees who have not signed arbitration agreements, and those claims will remain before this [c]ourt." <u>Id.</u> In <u>Davis</u>, the court rejected the defendant's argument that "conditional certification would be improper ... because most, if not all, of NMI's loan originators ha[d] signed arbitration agreements", in large part because the defendant had not yet moved to compel arbitration even though the case had been pending for a year. <u>Davis</u>, 408 F. Supp. 2d at 817-18.

Both <u>Mowdy</u> and <u>Davis</u> are distinguishable because here, the court has already determined that the Arbitration Policy is valid and defendants have already moved to compel arbitration as to some employees.   Under such circumstances, some courts have excluded from the collective action notice any employees who are bound by arbitration agreements.  See <u>Fischer v. Kmart Corp.</u>, Case No. 13–4116, 2014 WL 3817368, at *6, 8 (D.N.J. August 4, 2014) (court granted motion to compel arbitration and granted "motion for conditional certification with respect to current and former Assistant Store Managers who are not bound by the [Arbitration] Agreement, and ... den[ied] the motion for conditional certification with respect to the current and former Assistant Store Managers, including Opt–In Plaintiffs, who are bound"); <u>Daugherty v. Encana Oil & Gas (USA), Inc.</u>, 838 F. Supp. 2d 1127, 1130, 1133 (D. Colo. 2011) (court found that arbitration provisions in Independent Contractor Agreements were enforceable and court excluded from the collective action notice any employees who had signed ICAs that contained arbitration provisions).  However, in <u>Sylvester v. Wintrust Financial Corp.</u>, Case No. 12 C 01899, 2013 WL 5433593, at *9 (N.D. Ill. Sept. 30, 2013), the court observed that "the enforceability of arbitration clauses are dealt with on a case-by-case basis" and declined to limit the putative class to individuals who had not signed arbitration agreements, even though the court granted the defendants' motion to compel arbitration as to two plaintiffs.

Since June 1, 2003, all of defendants' new hires have been required to sign an Employment Arbitration Acknowledgment Form as a condition of their commencement of employment.[51]  This Acknowledgment Form binds these employees to defendants' Arbitration Policy, which the court has determined is valid and enforceable.[52]  Thus, there is no reason to give notice to any employee hired on or after June 1, 2003.  Any FLSA claims those employees might have must be arbitrated.  However, the court will allow notice to be given to all current and former Phoenix call center employees who were hired prior to June 1, 2003 whose primary job duty was to handle phone calls with customers, vendors and the public.  The notice shall however advise that any pre-June 1, 2003 employees who did not opt out of the Arbitration Policy will ultimately be excluded from the class and be subject to arbitration proceedings.

<u>Conclusion</u>

Kathol's motion to proceed as a collective action[53] is granted in part and denied in part. The court will conditionally certify a collective action but the proposed class is limited to current and former Phoenix call center employees who were hired prior to June 1, 2003

---

[51]Declaration of Arlene McKane at 1-2, ¶ 4, attached to Defendants' Motion to Compel Arbitration [etc.], Docket No. 31.

[52]Order re Motion to Compel Arbitration at 12, 21 & 24, Docket No. 50.

[53]Docket No. 22.

and with a primary job function of handling phone calls with customers, vendors, and the public.

The parties shall meet and confer about the notice that should be issued and shall submit a jointly proposed notice or any disagreements as to same on or before September 2, 2014. On or before September 9, 2014, defendants shall provide Kathol with a list of the names and addresses of all Phoenix call center employees who meet the class definition.

Defendants' motion for leave to file a sur-reply[54] is denied.

DATED at Anchorage, Alaska, this <u>18th</u> day of August, 2014.

/s/ H. Russel Holland
United States District Judge

---

[54]Docket No. 63.